## UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **PHILLIP SILVAGNI,** | : | |
| | : | **Civil Action No. 1:15-CV-00813** |
| | : | |
| **Plaintiff** | : | |
| | : | **(Judge Kane)** |
| **v.** | : | |
| | : | **(Magistrate Judge Schwab)** |
| **CAROLYN W. COLVIN,** | : | |
| **Commissioner of the** | : | |
| **Social Security Administration** | : | |
| | : | |
| **Defendant** | : | |
| | : | |

## <u>REPORT AND RECOMMENDATION</u>

Plaintiff Phillip Silvagni ("Mr. Silvagni") is an adult individual who resides in the Middle District of Pennsylvania. On September 30, 2005, when Mr. Silvagni was only twenty-five (25) years old, his brief career as a materials handler in a steel mill was ended after a catastrophic workplace accident. Mr. Silvagni sustained multiple injuries after a large industrial crane used to offload steel beams from railroad cars collapsed and fell on him. Mr. Silvagni's legs were pinned in place by the crane, and he reported that he was struck across his flank and right chest by falling debris. He remained trapped for ten to fifteen minutes before he was successfully extracted by the combined efforts of his co-workers and emergency medical services. Mr. Silvagni sustained multiple injuries and spent

over one month recovering in the hospital before he was transferred to a second facility for inpatient physical and occupational therapy.  Mr. Silvagni alleges that he has not been able to return to work due to ongoing symptoms related to the injuries he sustained.

Mr. Silvagni's date last insured was on March 31, 2011, and as such Mr. Silvagni must prove that he became disabled on or before that date in order to be eligible to receive benefits under Title II of the Social Security Act.  Many of the medical records available in this case post-date Mr. Silvagni's date last insured, and do not refer back to the period at issue.

Mr. Silvagni seeks judicial review of the final decision of the Commissioner of Social Security denying his application for disability insurance benefits. Jurisdiction is conferred on this Court pursuant to 42 U.S.C. §405(g).

This matter has been referred to the undersigned United States Magistrate Judge to prepare a report and recommended disposition pursuant to the provisions of 28 U.S.C. §636(b) and Rule 72(b) of the Federal Rules of Civil Procedure.

For the reasons stated herein, we recommend that the final decision of the Commissioner of Social Security denying Mr. Silvagni's applications for benefits be **VACATED**, and that Mr. Silvagni's request for a new administrative hearing be **GRANTED**.

## I.   BACKGROUND AND PROCEDURAL HISTORY.[1]

On September 29, 2010, Mr. Silvagni protectively filed an application for disability insurance benefits under Title II of the Social Security Act.   In his application, Mr. Silvagni alleged that he was unable to work due to cardiac problems, high blood pressure, ruptured discs, and degenerative spine.   *Admin Tr. 99.*   He also alleged that his disability began on September 30, 2005.   During his initial interview with the field office, the interviewer did not note any difficulties over the phone, except that approximately one hour in to the interview Mr. Silvagni said that he could no longer continue due to a problem with his back. *Admin Tr. 96.*

Mr. Silvagni's claim was denied at the initial level of administrative review on March 6, 2012.   The initial denial of his claim was based on medical opinions provided by nonexamining State agency consultants.   No medical opinion was offered by any treating or examining source.

The first nonexamining source opinion was from psychologist Dr. John Rohar ("Dr. Rohar").   *Admin Tr. 55.*   Dr. Rohar completed a psychiatric review technique ("PRT") form.   On his PRT form, Dr. Rohr found that there was sufficient evidence to establish that Mr. Silvagni suffered from a medically

---

[1] Although we have reviewed the record that was before the ALJ in its entirety, we have limited our discussion of the record to evidence that pertains to the period under review, which spans from September 30, 2005 through March 31, 2011.

determinable mental impairment, but that the symptoms related to Mr. Silvagni's mental impairment resulted in: no restriction of activities of daily living; mild difficulties in social functioning; mild difficulties in maintaining concentration, persistence or pace; and no repeated episodes of decompensation of extended duration.  Dr. Rohr provided the additional explanation that Mr. Silvagni's mental impairments were non-severe.

The second opinion was by nonexamining State agency medical consultant Mark Bohn ("Dr. Bohn").  *Admin Tr. 56-58*.  Based on the medical records that were available on March 5, 2011, Dr. Bohn assessed that Mr. Silvagni's impairments resulted in some degree of physical limitation, but Mr. Silvagni could: occasionally lift or carry up to twenty pounds; frequently lift ten pounds; stand and/or walk (with normal breaks) for a total of six hours per eight-hour workday; sit (with normal breaks) for a total of six hours per eight-hour workday; push or pull without restriction, except that Mr. Silvagni is limited in the use of his lower right extremity; occasionally (very little to one-third of the time) climb ramps or stairs, balance, stoop, kneel, crouch, and crawl; never climb ladders, ropes, or scaffolds; and, work in any environment where Mr. Silvagni would not be exposed to extreme cold, vibration, and hazards (machinery, heights, etc.).  Dr. Bohn explained that his assessment accounted for the surgical procedures performed on

Mr. Silvagni's left femur and right ankle in 2005, treatment notes documenting Mr. Silvagni's residual limp, and the result of a cardiac stress test.

After his claim was initially denied, Mr. Silvagni requested an administrative hearing. His request was granted, and on April 9, 2013, a hearing was held before Administrative Law Judge Therese A. Hardiman ("ALJ"). Impartial vocational expert Nadine Henzes ("VE Henzes") appeared and testified at the administrative hearing. Mr. Silvagni also appeared and testified. Although he was advised of his right to representation, Mr. Silvagni chose to testify without the assistance of an attorney or non-attorney representative.

During his hearing, Mr. Silvagni testified that the heaviest thing he had picked up in the past ten days was a bag of groceries weighing approximately ten pounds, and the last thing he picked up off of the floor was a single article of clothing. *Admin Tr. 38*. Mr. Silvagni demonstrated that he could raise his legs and put them down while sitting, and could reach overheard. *Admin Tr. 38*. Mr. Silvagni estimated that he could stand for approximately one hour when permitted to shift his weight from one foot to the other as needed. *Admin Tr. 39*. He estimated that he could sit for two hours at one time, and could walk up to three blocks at one time. *Admin Tr. 40*.

Mr. Silvagni reported that he currently takes the following medications: aspirin, 325 mg (daily) as a blood thinner; Metoprolol, 50 mg (daily) for blood

pressure; Cymbalta, 30 mg (daily) for pain, headaches, and sleep; Nitrostat (a brand of sublingual nitroglycerin), 0.4mg (as needed); Meclizine, 25 mg (as needed) for dizziness; B-complex; docusate sodium, 200 mg (daily); Omeprazole (dosage unknown) for his stomach; potassium (dosage unknown); and Ibuprofen and Tylenol (as needed) for pain. *Admin Tr. 40*. Mr. Silvagni testified that the Meclizine makes him very drowsy so he does not take it often. *Admin Tr. 40*. Mr. Silvagni also testified that he has never taken the Nitrostat. *Admin Tr. 41*. When asked about the effectiveness of his medications, Mr. Silvagni reported that he needs more medicine. *Admin Tr. 42*. In addition to his medications, Mr. Silvagni goes to acupuncture, which helps relieve some muscle tension and pain. He also reported that his symptoms are aggravated by quick movements, leaning forward, repetitive bending, riding in a moving car, staying in one position for a prolonged period of time, and standing for a prolonged period of time.

Mr. Silvagni lives alone in a one-and-one-half story home, but is frequently visited by his mother, brother, sister, and friends. *Admin Tr. 36, 37*. He testified that he goes up and down the stairs in his home less than one time per day. *Admin Tr. 38*. Mr. Silvagni reported that he is independent in his personal care tasks (e.g., bathing, grooming, and dressing, but gets help with household chores (e.g., cooking, cleaning laundry). *Admin Tr. 35*. He goes shopping infrequently. *Admin Tr. 37*. He explained that his mother usually does his shopping. Although Mr.

Silvagni readily admitted that he possessed a valid driver's license, he testified that he has not driven since his injury due to the limited range of motion in his neck and vertigo. *Admin Tr. 34*. Mr. Silvagni reported that he is able to use a computer to watch movies, play music, and to pursue his interest in the study of foreign languages. *Admin Tr. 36-37*.

Records from the date of Mr. Silvagni's initial injury reflect that, after being pulled from the wreckage of the crane collapse he complained of chest pain, back/left flank pain, right wrist pain, right ankle pain, and left femur pain. *Admin Tr. 186*. He was airlifted to Danville where he was examined at Geisinger Medical Center, and treated surgically by orthopedist Daniel Feldmann ("Dr. Feldmann").

Diagnostic imaging revealed that Mr. Silvagni had a comminuted distal closed left femur fracture[2] and right distal fibula fracture. Dr. Feldmann assessed that Mr. Silvagni required surgery to stabilize the factures in his left femur and right ankle. *Admin Tr. 136*. On September 30, 2005, an intramedullary rod was surgically implanted in Mr. Silvagni's left femur and was fastened in place by distal interlocking screws, and a plate and screws were attached across the fracture site in his right ankle. One of the screws implanted in Mr. Silvagni's ankle

---

[2] A comminuted fracture is a fracture in which the bone is broken into more than two fragments. *Stedman's Medical Dictionary* 769 (28th ed. 2006). A closed fracture is a fracture in which the skin is intact at the fracture site. *Id.*

extended across the fibula and entered the distal right tibia.[3]   Post-surgical x-rays showed that the hardware and fracture fragments were satisfactorily aligned. *Admin Tr. 198-99.*

X-rays of Mr. Silvagni's right hand and wrist revealed a small avulsion fracture[4] at the tip of his right elbow, and fracture of one of the carpal bones in his right wrist.  *Admin Tr. 220.*  The bony fragments were debrided from the wound. *Admin Tr. 136.*

Mr. Silvagni was also diagnosed with a small right apical pneumothorax (collapsed lung) based on a CT scan dated September 30, 2005.  *Admin Tr. 157, 300.*  No pneumothorax was visible in an x-ray taken on October 1, 2005.  *Admin Tr. 201, 219, 222.*  No acute abnormalities of the heart, lungs, mediastinum, or hila were observed.  *Admin Tr. 201.*  Mr. Silvagni also sustained a grade 1 liver contusion, right side 10th and 11th posterior rib fractures, a superficial chin laceration, and superficial abrasions across his back.  *Admin Tr. 158, 301.*  Further, because Mr. Silvagni was deemed a high risk for developing deep vein thrombosis,

---

[3] The Fibula is the smaller or "shin" bone in the lower leg.  *Stedman's Medical Dictionary* 727 (28th ed. 2006).  The tibia is the larger or "shin" bone in the lower leg.  *Id.* at 1989.

[4] An avulsion fracture is a fracture "that occurs when a joint capsule, ligament, or muscle insertion or origin is pulled from a bone as a result of a sprain, dislocation, or strong contracture of the muscle against resistance; as the soft tissue is pulled away from the bone, a fragment (or fragments) remains attached to the soft tissue of the bone." *Stedman's Medical Dictionary* 769 (28th ed. 2006).

a filter was surgically implanted in his inferior vena cava as a precaution against pulmonary embolism. *Admin Tr. 268-69.*

Mr. Silvagni was discharged from Geisinger in stable condition on October 18, 2005.  On discharge Mr. Silvagni was instructed that he was not permitted to drive or operate heavy machinery while taking his pain medications, could not bear any weight on his right leg, and could only bear toe touch weight as tolerated on his left leg. *Admin Tr. 297.*

On October 18, 2005, Mr. Silvagni was admitted to Muncy Valley Hospital ("Muncy") for inpatient physical therapy, where he remained until December 13, 2005. *Admin Tr. 344.*  It was noted on his discharge summary that Mr. Silvagni made a significant amount of progress at Muncy and manifested no other medical problems during his stay. *Admin Tr. 345.*  The record reflects that Mr. Silvagni was very vocal in his concern that he was being discharged from inpatient treatment prematurely. *Admin Tr. 369-71.*  Although Mr. Silvagni continued to complain of pain in his neck, wrist, arm, and foot, as well as vision changes and headaches, during follow-up appointments at Geisinger, on November 21, 2005, Mr. Silvagni was given permission to begin full weight bearing activities on his right leg, and partial weight bearing activities on his left leg. *Admin Tr. 278.*  X-rays taken in December 2005 revealed that Mr. Silvagni's right ankle and left femur fractures were healing, and that his internal fixation hardware remained in

9

place.  *Admin Tr. 290-96*.  It was also noted that Mr. Silvagni had a possible

derangement of his *right* knee, and it was recommended that an MRI be

scheduled.[5]  *Admin Tr. 291*.  It was recommended that Mr. Silvagni be scheduled

for removal of the screw installed in his right ankle in early February 2006.

In addition to his physical impairments, Mr. Silvagni met with Forrest

McLean, LCSW ("LCSW McLean") for crisis counseling approximately two times

per week while admitted at Muncy.  *Admin Tr. 361-62*.  LCSW McLean noted that

Mr. Silvagni had the following concerns that he wanted to address through therapy:

recurrent visions of the crane accident; apprehension about entering enclosed

structures; concern about being discharged too soon; concern for his future about

what he will do to support himself; and, concern regarding the residual neck pain,

headaches, and poor sleep.  *Admin Tr. 363*.

Mr. Silvagni was discharged from Muncy on December 13, 2005, and was

transferred to Gibson Rehabilitation Center in Williamsport ("Gibson").   On

admission it was noted that Mr. Silvagni's sitting balance was good, and that he

was able to stand from a chair independently and walk short distances with

crutches.  *Admin Tr. 342*.  The clinician assessed that Mr. Silvagni may be able to

---

[5] Although Mr. Silvagni initially complained about right knee pain, he then began
to complain of left knee pain instead.  An MRI of Mr. Silvagni's right knee was
ordered, but it is unclear whether it was completed or what the results were.  *Admin
Tr. 293*.  He did, however, undergo a left knee MRI in March 2007.  *Admin Tr.
410-11*.

return home in four or five days. Follow-up records reveal that Mr. Silvagni was discharged from Gibson after only three days, and reported that "Gibson couldn't do much for me." *Admin Tr. 346*. In subsequent treatment notes, Mr. Silvagni's surgeon opined that the extended amount of time Mr. Silvagni spent in rehabilitation was somewhat unusual for an otherwise young, healthy individual. *Admin Tr. 402*.

On February 14, 2006, Dr. Feldmann operated on Mr. Silvagni's ankle for a second time. During this surgery, Dr. Feldmann removed the screw that extended across the fibula and entered the distal right tibia. *Admin Tr. 375*.

On September 25, 2006, approximately one year after Mr. Silvagni's accident, Dr. Feldmann noted that Mr. Silvagni ambulated without assistance and that his femur and ankle fractures had fully healed. However, Mr. Silvagni was tender to palpation over the distal screws in his left femur and over the remaining hardware in his right ankle. *Admin Tr. 378-385*. In October 2006, Mr. Silvagni returned to Dr. Feldmann with complaints of ongoing left femur and right ankle pain. *Admin Tr. 386-92*. On November 2, 2006, Dr. Feldmann surgically removed the interlocking distal screws that were installed to stabilize the intramedullary rod in Mr. Silvagni's left femur, and removed the remaining screws and plate in Mr. Silvagni's right ankle. *Admin Tr. 444*. One week later Mr. Silvagni was able to ambulate with crutches. He reported, however, that he began to experience

paresthesias in his posterior thigh, leg, and foot. *Admin Tr. 393*. He was noted to be doing well post-op and was instructed to resume activities as tolerated.

In March 2007 Mr. Silvagni's former primary care physician Dr. Rebekah Tanner[6] ("Dr. Tanner"), referred Mr. Silvagni to Dr. Feldmann for an orthopedic consultation. Mr. Silvagni's mother accompanied him to the appointment. *Admin Tr. 401-04*. Mr. Silvagni reported that his right ankle gives out on him, and that he continues to have left knee and left hip pain. He alleged that he was completely and utterly disabled and unable to do anything as a result of this pain. Dr. Feldmann assessed that the majority of Mr. Silvagni's problems were related to post-traumatic stress disorder and chronic pain syndrome. He also noted that although Dr. Tanner had referred Mr. Silvagni to a psychiatrist for treatment, Mr.

---

[6] Although there is some evidence that Mr. Silvagni was seeing Dr. Tanner during the relevant period until sometime in 2010, no treatment records from Dr. Tanner were available in the administrative record before the ALJ. The administrative development summary reflects that the Social Security Administration mailed two records requests, and unsuccessfully attempted to contact Dr. Tanner's office by telephone on February 15, 2012. *Admin Tr. 518-22*. The regulations require the Social Security Administration to make "every reasonable effort" to develop the administrative record. 20 C.F.R. §404.1512(d). "Every reasonable effort" is defined by the regulations as "an initial request for evidence from your medical source and, at any time between 10 and 20 calendar days after the initial request, if the evidence has not been received, we will make one follow-up request to obtain the medical evidence necessary to make a determination. *Id.*
　　In late 2010, or very early 2011, Mr. Silvagni reported that he recently switched primary care physicians and was now seeing Todd W. Fausnaught ("Dr. Fausnaught"). *Admin Tr. 482*. On September 30, 2011, Mr. Silvagni began seeing Dakshina Walgampaya ("Dr. Walgampaya"). *Admin Tr. 458*.

Silvagni did not pursue that recommendation.  Dr. Feldmann concluded that Mr. Silvagni had no active orthopedic problems.  At Mr. Silvagni's insistence, an MRI of his left knee was ordered.  The MRI revealed mild degeneration of the posterior horn of the medial meniscus. *Admin Tr. 411.*

Mr. Silvagni returned to Dr. Feldmann in July 2007 to review his MRI results.  After learning that Mr. Silvagni had not yet sought out any psychological treatment, Dr. Feldmann scheduled an emergency evaluation for him.  Dr. Feldmann also noted that Mr. Silvagni "has nothing further that can be done orthopaedically and has reached maximal medical improvement from his orthopaedic injuries.  However, I do believe he has ongoing depression issues and whether or not this is true depression versus issues with malingering and secondary gain I truly do not know, and this is certainly out of the realm of my expertise and comfort." *Admin Tr. 418.*  Dr. Feldmann also opined that Mr. Silvagni's mother was a roadblock to Mr. Silvagni's recovery from an orthopedic perspective.  Dr. Feldmann noted and that he had no desire to see Mr. Silvagni, or his mother, in the future.

In November 2008 an MRI of Mr. Silvagni's cervical spine revealed the impression of mild posterior disc bulging at C5-C6 and C6-C7.  Neither disc was shown to be causing central spinal or neural foraminal stenosis, and there was no evidence of direct impingement on the spinal cord. *Admin Tr. 460.*  A November

2008 MRI of Mr. Silvagni's lumbar spine revealed the impression of mild generalized disc bulging at L2-L3 and L3-L4. *Admin Tr. 461*. An MRI of his thoracic spine was normal. *Admin Tr. 462*.

On October 1, 2009, Mr. Silvagni had a diagnostic catheterization which revealed severe obstructive coronary artery disease of one vessel. A balloon angioplasty with stent insertion was performed. *Admin Tr. 489*. It was believed that the severe obstruction in Mr. Silvagni's artery was likely post-traumatic, and was related to the chest-crushing injuries he sustained in 2005. Mr. Silvagni returned to his cardiologist, John Burks ("Dr. Burks") on October 21, 2009, because he was concerned that he had a blood clot in his hand, and because he had "chills, shakes, and headaches." *Admin Tr. 471-72*. Dr. Burks assessed that Mr. Silvagni's chills, shakes and headaches were not related to any cardiac problem. Dr. Burks also noted that, although Mr. Silvagni did have a small area of ecchymosis on his left wrist, it was of no clinical significance and was possibly the result of a contusion in the presence of his medications. Dr. Burks assessed that from a cardiovascular standpoint, Mr. Silvagni was doing very well.

Mr. Silvagni returned for follow-up care in July 2010. An EKG was performed and yielded "borderline" results. *Admin Tr. 470, 483-44*. Dr. Burks noted that Mr. Silvagni's hypertension was not optimally controlled, but that he

was in excellent cardiac status about ten months from a threatened large anteroseptal infarction.

Mr. Silvagni was examined by a second orthopedist, Gerard J. Cush ("Dr. Cush") at Geisinger in September 2010.  During the examination Mr. Silvagni complained of persistent right ankle pain despite hardware removal.  *Admin Tr. 423-25*.  During the examination Mr. Silvagni reported that he had recently suffered a fall.  Dr. Cush assessed that there was no clear cause for Mr. Silvagni's ankle pain, and that an MRI was necessary.  Mr. Silvagni's foot was placed in a boot for immobilization to help decrease his pain.

Mr. Silvagni returned to Dr. Cush in October 2010.  An MRI of his right foot revealed a non-displaced fracture in the first metatarsal base (the bone in the foot just behind the big toe), and bone contusions involving the intermediate cuneiform and second metatarsal head.  *Admin Tr. 434*.  An MRI of his ankle revealed a 0.4 centimeter osteochondral lesion to the medial talar dome.[7]  *Admin Tr. 434-35*.  Dr. Cush assessed that Mr. Silvagni had right foot pain and noted the imaging showing an acute non-displaced fracture in the metatarsal base, but did not specifically address the osteochondral lesion in his assessment.  Dr. Cush also assessed that Mr. Silvagni had some kind of psychiatric issue, but noted that it was

---

[7]  An osteochondral lesion, or osteochondritis dissecans, is a complete or incomplete separation of a portion of joint cartilage and underlying bone. *Stedman's Medical Dictionary* 1389 (28th ed. 2006).

15

unclear whether the psychiatric issue was related to Mr. Silvagni's chronic pain and frustration or whether it was something more serious. *Admin Tr. 438*. Dr. Cush recommended a more supportive custom orthotic to protect Mr. Silvagni's mid foot, and use of a bone stimulator. He was instructed to follow-up in eight weeks to assess his progress and determine if surgical or "open" treatment would be necessary. We have no record of whether Mr. Silvagni returned to Dr. Cush.

In January 2011, Mr. Silvagni reported to the hospital with complaints of atypical chest pain. *Admin Tr. 481*. He underwent a stress Myoview study, which was read as normal. *Admin Tr. 482*.

On May 20, 2013, the ALJ denied Mr. Silvagni's request for benefits in a written decision. Mr. Silvagni requested further review of his claim by the Appeals Council of the Office of Disability Adjudication and Review. His request was denied on February 24, 2015.

On April 24, 2015, Mr. Silvagni filed a complaint in this Court alleging that he is totally disabled under the Social Security Act. *Doc. 1*. In response the Commissioner filed an answer, in which she asserts that the final decision denying Mr. Silvagni's claim is correct and that the decision was made in accordance with the law and regulations and is supported by substantial evidence. *Doc. 5*. Together with her answer, the Commissioner filed a certified copy of the record of

the administrative transcript. *Doc. 6.* This matter has been fully briefed by the parties and is now ripe for decision. *Docs. 7, 8.*

## II.   LEGAL STANDARDS.

### A.   SUBSTANTIAL EVIDENCE REVIEW – THE ROLE OF THIS COURT.

When reviewing the Commissioner's final decision denying a Social Security claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. § 405(g); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200(3d Cir. 2008); *Ficca v. Astrue*, 901 F.Supp.2d 533, 536(M.D.Pa. 2012).  Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 565 (1988).  Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993).  But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by

substantial evidence." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966).  "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." *Leslie v. Barnhart*, 304 F.Supp.2d 623, 627 (M.D.Pa. 2003).  The question before this Court, therefore, is not whether Mr. Silvagni is disabled, but whether the Commissioner's finding that he is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law.  *See Arnold v. Colvin,* No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D.Pa. Mar. 11, 2014)("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence.")(alterations omitted); *Burton v. Schweiker*, 512 F.Supp. 913, 914 (W.D.Pa. 1981)("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); *see also Wright v. Sullivan*, 900 F.2d 675, 678 (3d Cir. 1990)(noting that the scope of review on legal matters is plenary); *Ficca*, 901 F.Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

## B.     INITIAL BURDENS OF PROOF, PERSUASION, AND ARTICULATION FOR THE ALJ.

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §423(d)(1)(A);

*see also* 20 C.F.R. §404.1505(a).  To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. §423(d)(2)(A); 20 C.F.R. §404.1505(a).  To receive benefits under Title II of the Social Security Act, a claimant must also show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured.  42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process.   20 C.F.R. §404.1520(a).   Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC").   20 C.F.R. §404.1520(a)(4).

Between steps three and four, the ALJ must also assess a claimant's RFC. RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)."  *Burnett v. Comm'r of Soc. Sec.,*

220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); *see also* 20 C.F.R. §§404.1520(e), 404.1545(a)(1).  In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis.  20 C.F.R. §404.1545(a)(2).

At steps one through four, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work.  42 U.S.C. §423(d)(5); 20 C.F.R. §404.1512; *Mason*, 994 F.2d at 1064.

Once this burden has been met by the claimant, it shifts to the Commissioner at step five to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC.  20 C.F.R. §404.1512(f); *Mason*, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic procedural and substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." *Cotter v. Harris*,

642 F.2d 700, 704 (3d Cir. 1981).  Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. *Id.* at 706-707.  In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding."  *Schaudeck v. Com. of Soc. Sec.*, 181 F. 3d 429, 433 (3d Cir. 1999).

## III.    DISCUSSION.

### A. THE ALJ'S DECISION DENYING MR. SILVAGNI'S CLAIMS.

In his written decision denying Mr. Silvagni's application for benefits, the ALJ found that Mr. Silvagni last met the insured status requirements of the Social Security Act on March 31, 2011. *Admin Tr. 20.*  The ALJ evaluated Mr. Silvagni's claim at steps one and two of the five step-sequential evaluation process, and found at step two that Mr. Silvagni was 'not disabled.'

At step one, the ALJ found that although Mr. Silvagni worked after his alleged disability onset, the work engaged in did not rise to the level of substantial gainful activity. *Admin Tr. 20.*

At step two, the ALJ assessed that Mr. Silvagni had the following medically determinable impairments: status post-industrial accident resulting in bilateral lower extremity, right hand, wrist, and right ankle fracture, abdominal pain, liver laceration, cerebral spinal fluid leak, cervical and lumbar sprain, and concussion,

21

degenerative joint disease of the left knee, gastroesophageal reflux disease (GERD), hypokalemia (potassium deficiency), hyperthyroidism, hyperlipidemia, depression, and status post broken toe. *Admin Tr. 20*. The ALJ also found, however, that none of Mr. Silvagni's medically determinable impairments significantly limited Mr. Silvagni's ability to engage in basic work-related activities for 12 consecutive months. The ALJ then concluded that Mr. Silvagni was not disabled at any time from September 30, 2005, through March 31, 2011, because the medical evidence of record did not establish the existence of a medically determinable severe impairment before Mr. Silvagni's date last insured.

### B. THE ALJ'S DECISION THAT MR. SILVAGNI DID NOT HAVE A SEVERE IMPAIRMENT IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE.

Mr. Silvagni argues that he submitted sufficient evidence to show that he was suffering from a medically determinable severe impairment. In his brief, Mr. Silvagni argues that the medical evidence of record illustrates that he had a persistent problem with his ability to ambulate as a direct result of his fractured left femur and fractured right ankle. *Doc. 7 pp. 13*-14. He asserts that the ALJ failed to assess the impact of the residual pain resulting from these injuries, and the affect these limitations would have on Mr. Silvagni's ability to engage in basic work activities. *Id.* Mr. Silvagni also contends that the evidence of record supports a

conclusion that he is suffering from a mental health condition, and that the ALJ failed to take the necessary steps to develop the record on this issue. *Id.*

In response, the Commissioner asserts that the ALJ appropriately found that, as of Mr. Silvagni's date last insured, there were no longitudinal signs or laboratory findings to support any functional limitations. *Doc. 8 pp. 14-22.*

At step two of the sequential evaluation process, the ALJ considers whether a claimant's impairments are (1) medically determinable or non-medically determinable, and (2) severe or non-severe. *See* 20 C.F.R. §404.1520(a)(4)(ii)("If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 404.1509, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled."); SSR 96-4p, 1996 WL 374187 at *1 ("In the absence of a showing that there is a 'medically determinable physical or mental impairment,' an individual must be found not disabled at step 2 of the sequential evaluation process."). Although it is the claimant who bears the burden of proof at step two of the sequential evaluation process, this burden is not an exacting one. *McCrea v. Comm'r of Soc. Sec.,* 370 F.3d 357, 360 (3d Cir. 2004). In *McCrea*, the Third Circuit observed that:

> The Commissioner's denial at step two, like one made at any other step in the sequential evaluation analysis, is to be upheld if supported by substantial evidence on the record as a whole. *See Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992)("Neither the district

> court nor this court is empowered to weigh the evidence or substitute
> its conclusions for those of the fact-finder.").   Instead, we express
> only the common-sense position that because step two is to be rarely
> utilized as basis for the denial of benefits, *see* SSR 85-28, 1985 WL
> 56856, at *4 ("Great care should be exercised in applying the not
> severe impairment concept."), its invocation is certain to raise the
> judicial eyebrow."

*Id.* at 360-61.   The claimant need only demonstrate something beyond a "slight

abnormality or a combination of slight abnormalities which would have no more

than a minimal effect on an individual's ability to work . . . ."   SSR 85-28, 1895

WL 56856 at *3.   Similarly, the Commissioner's regulations provide that "[a]n

impairment is not severe if it does not significantly limit [a claimant's] physical or

mental ability to do basic work activities." [8]   20 C.F.R. §404.1521(a).

SSR 85-28 cautions that:

> Great care should be exercised in applying the not severe impairment
> concept. If an adjudicator is unable to determine clearly the effect of
> an impairment or combination of impairments on the individual's
> ability to do basic work activities, the sequential evaluation process
> should not end with the not severe evaluation step. Rather, it should
> be continued.

1895 WL 56856 at *4.   Based on this guidance, Courts have reasoned that the step-

two inquiry is merely "a *de minimis* screening device to dispose of groundless

---

[8] Basic work activities include: physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; capacities for seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and, dealing with changes in a routine work setting. 20 C.F.R. §404.1521(b).

claims, and have found that "[a]ny doubt as to whether this showing has been made is to be resolved in favor of the applicant." *McCrea*, 370 F.3d at 360.

Bearing these principles in mind, we must decide whether the Commissioner's determination that Mr. Silvagni failed to demonstrate the presence of more than a slight abnormality at step two is supported by substantial evidence. Our review of the record convinces us that it is not.

In his decision, the ALJ emphasized several factors undermine the credibility of Mr. Silvagni's allegations.  The ALJ cited to evidence that Mr. Silvagni relied primarily upon over-the-counter medications to treat his pain, was able to engage in a wide range of activities, and that Mr. Silvagni's complaints of disabling pain in 2007 were contradicted by x-rays showing that his fractures had healed.  The ALJ also noted that Mr. Silvagni was able to ambulate without an assistive device, exhibited normal strength and reflexes during some of the later examinations, MRIs of Mr. Silvagni's cervical and lumbar spine reveled only mild abnormalities, and that the MRI of Mr. Silvagni's *right* knee revealed only mild degenerative and surgical changes.[9]  While we acknowledge that these observations may be relevant in later steps of the sequential analysis, they are not enough to support a denial of benefits at step two.

---

[9] There is no MRI of Mr. Silvagni's right knee in the record.

Furthermore, although the ALJ acknowledged that Mr. Silvagni had multiple surgeries following his accident, he minimized the importance of these surgeries in his decision.  The evidentiary record reflects that, after he was crushed by a large industrial crane and several steel beams, Mr. Silvagni underwent multiple surgeries, spent months in the hospital, and was unable to engage in any weight-bearing activities on either leg for a significant period of time.  Although the records document that Mr. Silvagni's condition improved over time, the records relating to the year immediately following his injury reflect that he reported ongoing pain to his treating medical sources.  These allegations are corroborated by the fact that Mr. Silvagni underwent two additional surgeries to remove internal fixation hardware in an attempt to reduce it.  It was not until March 2007 – more than twelve months after the accident – that Dr. Feldmann assessed that Mr. Silvagni had no active orthopedic problems.  Furthermore, despite Dr. Feldmann's pronouncement, Mr. Silvagni continued to seek orthopedic care for ongoing pain that he believes relates back to his 2005 accident after Dr. Feldmann discharged him as a patient.  Moreover, the only medical source of record to offer an assessment of Mr. Silvagni's physical impairments found that there was sufficient evidence to prove that his injuries resulted in significant physical limitations.

Because the ALJ failed to reconcile his conclusions with the evidence that contradicted his assessment we cannot find that the ALJ's determination that Mr.

Silvagni had no medically determinable severe impairment is supported by substantial evidence. Furthermore, viewing the record in its entirety, the ongoing symptoms related to Mr. Silvagni's 2005 injury were severe under the *de minimis* interpretation of the term endorsed by the Commissioner.

## IV.   RECOMMENDATION

Accordingly, for the foregoing reasons IT IS RECOMMENDED that:

(1) The decision of the Commissioner be VACATED, and that Phillip Silvagni's claim be REMANDED to the Commissioner for a new administrative hearing pursuant to sentence four of 42 U.S.C. §405(g); and,

(2) Final Judgment be entered in Favor of Phillip Silvagni and Against the Commissioner of Social Security.

Any party may obtain a review of the Report and Recommendation pursuant to Rule 72.3, which provides:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636(b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record

developed before the magistrate judge, making his or her own determination on the basis of that record.  The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Failure to file timely Objections to the foregoing Report and

Recommendation may constitute a waiver of any appellate rights.

Respectfully Submitted September 12, 2016.

                                    ***S/Susan E.  Schwab***
                                    Susan E. Schwab
                                    United States Magistrate Judge